

**IT IS ORDERED as set forth below:**

**Date: September 30, 2021**

_____
**Paul Baisier**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | CASE NO. **12-11393-PMB** |
| **KENNETH L. GREEN** | : | |
| **and CYNTHIA R. GREEN,** | : | |
| | : | CHAPTER 11 |
| Debtors. | : | |
| _____ | : | |
| | : | |
| **FREEPORT TITLE & GUARANTY, INC.,** | : | |
| **AS TRUSTEE OF THE TROUP COUNTY** | : | |
| **THREE TRUST,** | : | |
| | : | |
| Petitioner, | : | |
| | : | ADVERSARY PROCEEDING |
| v. | : | |
| | : | NO. **19-1029** |
| **SUMMITBRIDGE NATIONAL** | : | |
| **INVESTMENTS V, LLC,** | : | |
| | : | |
| Respondent/Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |

**KENNETH L. GREEN**                                          :
**And CYNTHIA R. GREEN,**                                     :
                                                             :
        Third-Party Defendants.              :
_____      :

### ORDER GRANTING PETITIONER'S
### MOTION FOR SUMMARY JUDGMENT
### AND DENYING IN PART AND DEFERRING IN PART
### RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on cross motions for summary judgment as follows:

(1) *Motion for Summary Judgment* and *Statement of Material Facts* filed by SummitBridge National Investments V, LLC, Respondent/Third-Party Plaintiff named above (the "<u>Respondent</u>") on June 4, 2021 (Docket No. 32)(the "<u>Respondent's Motion</u>" and the "<u>Respondent's Statement of Facts</u>," respectively);

(2) *Response to SummitBridge National Investments V, LLC's Motion for Summary Judgment* filed by Freeport Title & Guaranty, Inc. as Trustee of the Troup County Three Trust (the "<u>Petitioner</u>") on June 25, 2021 (Docket No. 36)(the "<u>Petitioner's Response</u>") and *Response to SummitBridge National Investments V, LLC's Statement of Material Facts* also filed by the Petitioner on June 25, 2021 (Docket No. 37)(the "<u>Petitioner's Response to Respondent's Statement of Facts</u>");

(3) *SummitBridge National Investments V, LLC's Reply Brief in Support of Motion for Summary Judgment* filed on July 2, 2021 (Docket No. 38)(the "<u>Respondent's Reply</u>");

(4) *Freeport Title & Guaranty, Inc., As Trustee of the Troup County Three Trust's Motion for Summary Judgment* and *Statement of Material Facts Not In Dispute* filed by the

Petitioner on June 4, 2021 (Docket No. 33)(the "Petitioner's Motion" and the "Petitioner's Statement of Facts," respectively); and

(5) *Response to Motion for Summary Judgment* filed by the Respondent on June 25, 2021 (Docket No. 34)(the "Respondent's Response") and *Response to Petitioner Freeport Title & Guaranty, Inc., As Trustee of the Troup County Three Trust's Statement of Material Facts Not In Dispute* also filed by the Respondent on June 25, 2021 (Docket No. 35)(the "Respondent's Response to Petitioner's Statement of Facts").

### Procedural Background

The Respondent commenced this Adversary Proceeding (the "Adversary Proceeding") through the filing of a *Notice of Removal and Motion to Reopen* on November 1, 2019 (Adversary Docket No. 1)(the "Motion to Reopen").   In the Motion to Reopen, the Respondent sought to remove the *Verified Petition to Quiet Title* filed by the Petitioner in the Superior Court of Troup County, Georgia on September 17, 2019 (Case No. 19-CV-0535)(the "Petition to Quiet Title") to this federal court under 28 U.S.C. § 1452 and Federal Rule of Bankruptcy Procedure 9027.[1]   The Respondent filed *Respondent SummitBridge National Investments V, LLC's Answer, Affirmative Defenses, and Counterclaims* on November 4, 2019 (Adversary Docket No. 3),[2] and the Petitioner

---

[1]  The Respondent had previously filed the *Notice of Removal and Motion to Reopen* in Case No. 12-11393 (the "Main Case") on October 28, 2019 (Main Case Docket No. 123).   The Court granted the Motion to Reopen through an *Order* entered on November 1, 2019 (Main Case Docket No. 125).   Kenneth L. Green and Cynthia R. Green, the Debtors named above (the "Debtors"), commenced the Main Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on May 11, 2012 (the "Petition Date")(Main Case Docket No. 1).   An *Order Granting Debtor's Motion To Administratively Close Individual Chapter 11 Case* was entered on January 10, 2014 (Main Case Docket No. 119)(the "Order Administratively Closing Case") and this Chapter 11 case was closed on March 5, 2014 (Main Case Docket, *passim*).

[2]  As discussed further herein, the Respondent filed a six (6) count counterclaim against the Petitioner (the "Counterclaims").   The Respondent also filed a Third-Party Complaint against the Debtors on November 4, 2019 (Adversary Docket No. 4)(the "Third-Party Complaint").

3

filed its *Answer To SummitBridge National Investments V, LLC's Counterclaims* on November 25, 2019 (Adversary Docket No. 5).   The Court entered a *Consolidated Pretrial Order* in this Adversary Proceeding on September 15, 2020 (Adversary Docket No. 22)(the "Pretrial Order").[3] Because the Petitioner[4] appeared to assert in the Pretrial Order that this Court lacks subject matter jurisdiction, the Court entered an *Order Setting Deadline For Filing Of Motion To Dismiss* on February 9, 2021 (Adversary Docket No. 25)(the "Order Setting Deadline").   No motion was filed following entry of the Order Setting Deadline.

The Court subsequently held a telephonic status conference on this matter on May 12, 2021.   *See Order And Notice Of Telephonic Status Conference*, filed on April 1, 2021 (Adversary Docket No. 28)(the "Status Conference").   Present at the Status Conference were counsel for the Petitioner and counsel for the Respondent, who each agreed that there are no pending factual issues for trial and that this matter could be resolved through briefing on the remaining legal issues.[5] The parties further agreed to the terms of a scheduling order for filing cross motions for summary judgment, responses, and any replies thereto.   On May 13, 2021, the Court entered a *Scheduling Order Setting Deadlines for Filing Cross Motions for Summary Judgment, Responses, and Replies* (Docket No. 30), which the parties responded to by filing the above-cited cross motions for decision herein.

---

[3] The Main Case and this Adversary Proceeding were reassigned to Judge Paul M. Baisier on September 29, 2020. (Main Case Docket No. 138; Adversary Docket No. 24).

[4] The Pretrial Order refers to the Petitioner as "Plaintiff" and the Respondent as "Defendant."

[5] During the Status Conference, counsel for the Petitioner confirmed that the Petitioner does not challenge the jurisdiction of this Court.   Although both parties moved for summary judgment on the quiet title claim as discussed below, only the Respondent moved for summary judgment on the Counterclaims.

## Legal Standard

Summary judgment may be granted pursuant to Federal Rule of Civil Procedure 56, which is made applicable herein by Federal Rule of Bankruptcy Procedure 7056, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In deciding a motion for summary judgment, the court "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The initial burden of proving the absence of dispute as to any material fact rests with the moving party. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In meeting this initial burden, the moving party must identify "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)(internal quotations omitted).[6] Once the party moving for summary judgment has identified those materials demonstrating the absence of a genuine issue of material fact, the non-moving party cannot rest on mere denials or conclusory allegations, but must go beyond the pleadings and designate, through proper evidence such as by

---

[6] On an issue where the burden of proof at trial will be borne by the non-moving party, the movant may simply "[point] out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra*, 477 U.S. at 325, quoted in *Mandel v. Target Corp.*, 2013 WL 12084296, at *1 (S.D. Fla. Nov. 18, 2013). Similarly, "[w]hen the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways— by negating an essential element of the nonmovant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case." *Marshall v. Penland*, 2015 WL 1909915, at *2 (S.D. Ga. Apr. 27, 2015), citing *Coats & Clark, supra*, 929 F.2d at 606–08.

affidavits or personal knowledge or otherwise, specific facts showing the existence of a genuine issue for trial. *See* Fed.R.Civ.P. 56(c) & (e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Johnson v. Fleet Finance Inc.*, 4 F.3d 946, 948-49 (11th Cir. 1993); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993).

All reasonable doubts should be resolved in favor of the non-moving party, and "[i]f reasonable minds could differ on any inferences arising from undisputed facts, summary judgment should be denied." *Twiss v. Kury*, 25 F.3d 1551, 1555 (11th Cir. 1994)(citing *Mercantile Bank & Trust Co. v. Fidelity & Dep. Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). When cross motions for summary judgment are presented, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standards." *RES-GA Diamond Meadows, LLC v. Robertson (In re Robertson)*, 576 B.R. 684, 699 (Bankr. N.D. Ga. 2017)(citations omitted).

### Facts

The following facts are undisputed unless otherwise stated. The Debtors transferred the real property that is at the heart of this Adversary Proceeding (the "Transfer") to the Petitioner via quitclaim deed dated August 16, 2019 (the "Quitclaim Deed"). [7] The Transfer is, in many

---

[7] *See* Petitioner's Motion, copy of Quitclaim Deed attached thereto as Exhibit "A;" Respondent's Statement of Facts ¶ 21 referencing Exhibit "G" as attached thereto. The Quitclaim Deed was filed and recorded in the Troup County, Georgia real property records on September 4, 2019 in Deed Book 1992 at Page 161. No party has challenged the authenticity of the other party's copies of documents as attached to their respective filings. The property transferred consisted of three (3) different tracts as follows: (1) 415 Ashford Circle, LaGrange, Georgia 30240 (the "Ashford Circle Tract"); (2) 210 White Street (Respondent states, and the Petitioner does not dispute, that the correct address should be 210 White *Avenue*), Hogansville, Georgia 30230 (the "White Avenue Tract"); and (3) 517 Boyd Road, Hogansville, Georgia 30230 (the "Boyd Road Tract")(collectively, the "Property"). The status of title to the Property is the subject of the Petition to Quiet Title. The parties dispute the legal issue regarding whether the Petitioner is the

respects, the end of a lengthy story.   Over twelve (12) years before the Transfer, on February 16, 2007, the Debtors executed a *Promissory Note* for $320,831.27 (the "Note") and a *Georgia Security Deed and Security Agreement* (the "Security Deed") conveying legal title to the Property to Branch Banking & Trust Company ("BB&T") to secure payment of the Note and related obligations (the "Debt").   The Security Deed was recorded in the Troup County, Georgia real property records at Deed Book 1393, Page 706, and reflects that the Debt evidenced by the Note had an original maturity date of February 19, 2012.[8]   BB&T and the Debtors entered into a *Modification Agreement to Georgia Security Deed and Security Agreement* on April 27, 2011 (the "Modification Agreement") that extended the maturity date of the Debt to April 27, 2012.   The Modification Agreement was also recorded in the Troup County, Georgia real property records.[9]

As noted above, the Debtors commenced this bankruptcy case on May 11, 2012.   In their Amended Schedule A (Main Case Docket No. 46), the Debtors valued the Property at $325,000.00. The Court confirmed the Debtors' *First Amended Plan of Reorganization* (Main Case Docket No. 71)(the "Plan") by *Order Confirming Plan* entered on July 22, 2013.   *See* Main Case Docket No.

---

owner of the Property, as it claims, under state law or whether Transfer of the Property to the Petitioner by the Debtors was fraudulent under state law and federal bankruptcy law, as asserted by the Respondent.

[8] The Petitioner attached a copy of the Security Deed to its Motion as Exhibit "B," and the Respondent attached a copy to its Respondent's Statement of Facts as Exhibit "A."   *See also* BB&T Proof of Claim No. 6, filed on June 11, 2012, asserted in the amount of $231,072.14.

[9] The copies of the Modification Agreement attached to both parties' moving papers bear a recording date of May 5, 2011 referencing Deed Book 1610, Page 716.   *See* Petitioner's Motion, attached thereto as Exhibit "C;" Respondent's Statement of Facts ¶ 4 referencing Exhibit "B" as attached thereto.   As discussed further herein, at issue in this matter is whether title to the Property reverted to the Debtors under O.C.G.A. § 44-14-80.   In support of its position, the Petitioner alleges that the Debt secured by the Security Deed matured and the maturity date was not extended.   The Respondent, however, asserts that the maturity date was extended based on the subsequent Modification Agreement as well as the Debtors' confirmed Chapter 11 bankruptcy plan and its treatment of the Debt owed to Respondent.   *See* Respondent's Response to Petitioner's Statement of Facts, ¶ 3; Petitioner's Response to Respondent's Statement of Facts, ¶¶ 3 & 8.

85 (the "Confirmation Order").    Under the confirmed Plan (¶ 4.4), BB&T's secured claim[10] was

fixed at $231,072.14, and it was to receive monthly payments of principal and interest at $1,557.07,

with the remaining balance, including post-petition interest and fees, becoming due on the "Class

4 Maturity Date" that the Plan defined as "the 20th day…[after] the 60th month following the

Effective Date…."[11]    Since the Effective Date is defined in the Plan as "the date that is sixty (60)

days after entry of the Confirmation Order" (see ¶ 2.1.28), the Class 4 Maturity Date is calculated

as September 20, 2018.[12]

　　　BB&T assigned its interest in the Property to the Respondent on June 28, 2016.[13]    By early

2019, the Debtors had defaulted with regard to their obligations under the Note and the Security

Deed as modified through the Plan.    During 2019, the Respondent and the Debtors engaged in

negotiations regarding the repayment of the Debt.    In September of 2019, the Respondent sought

to enforce its rights as asserted under the Security Deed by advertising the Property for a

---

[10] With respect to the Property, the Plan describes BB&T as having a second priority interest in the Ashford Circle Tract and a first priority interest in the Boyd Road Tract and White Avenue (Street) Tract.

[11] The Petitioner disputes the implication that the Security Deed is still valid.    Petitioner's Response to Respondent's Statement of Facts, ¶ 9.

[12] In disputing the Respondent's statement that "[t]he Plan extended the maturity date of the Note and the Security Deed to September 20, 2018" (see Respondent's Statement of Facts, ¶ 8), the Petitioner alleges that "[w]hile the Plan may have extended the maturity date, neither the confirmation order nor the plan nor an affidavit regarding either was filed in the real estate records as is required to prevent reversion."    Petitioner's Response to Respondent's Statement of Facts, ¶ 8.    The Respondent has not replied to or otherwise disputed the statement by the Petitioner that nothing was filed in the state real property records regarding the Plan by the Respondent, and it does not appear to be controverted.    In fact, the Respondent argues that such filing is unnecessary under applicable state law.    As noted above, an Order Administratively Closing Case was entered on January 10, 2014 and this chapter 11 case was closed on March 5, 2014 (Main Case Docket, passim).

[13] See Assignment of Security Instruments, recorded in Deed Book 1838, Page 338, copy attached to Respondent's Statement of Facts as Exhibit "C."

foreclosure sale.[14]    Upon seeing the notice of foreclosure, a representative of the Petitioner

contacted the Debtors and worked out an arrangement by which the Petitioner would take title to

the Property and file an action to stop the foreclosure from proceeding.[15]    Through the Transfer

the Debtors conveyed their interest in the Property to the Petitioner via the Quitclaim Deed dated

August 16, 2019.    *See* Petitioner's Response to Respondent's Statement of Facts, ¶ 21.[16]    As of

December of 2019, the Debtors still resided at the Ashford Circle Tract.[17]

---

[14] Petitioner's Statement of Facts, ¶ 5.    Although the Petitioner does not dispute that the Respondent initiated foreclosure proceedings, it does dispute the Respondent's right to foreclose on the Property.    *See* Petitioner's Response to Respondent's Statement of Facts, ¶ 13.    A copy of the foreclosure advertisement is attached to the Verified Petition to Quiet Title as Exhibit "F," which in turn, is attached to the Motion to Reopen as Exhibit "B." (Adversary Docket No. 1).

[15] The Debtors and the Petitioner agreed that if the Petitioner succeeded, it would sell the Ashford Circle Tract to the Debtors for $20,000.00 plus attorneys' fees.    Further, the Petitioner agreed to retain ownership of the Boyd Road and White Avenue Tracts, renting the former to the Debtors for $800.00 per month and the latter to its current tenant at $300.00 per month.    *See* Respondent's Statement of Facts ¶¶ 15-18 and Exhibit "F" as attached thereto.    The discrepancy between a September foreclosure advertisement and an August date for the Quitclaim Deed is not explained.

[16] As noted above, the Quitclaim Deed bears a filing date of September 4, 2019.    The Respondent contends it was not informed about the Transfer at the time of its occurrence.    The Petitioner claims it lacked knowledge that the Respondent and the Debtors were in negotiations at this time.    The parties also dispute the value of the Property at the time of the Transfer, with the Respondent asserting a combined value of $336,790.00 based on county tax records, and the Petitioner insisting the value was virtually worthless due to the unmarketability of its title.    Further, although the Respondent states the Petitioner paid no meaningful consideration for the Transfer, the Petitioner argues consideration was furnished through its agreement to engage in efforts to clear the title.    Petitioner's Response to Respondent's Statement of Facts ¶¶ 22-26.    The Petitioner filed its Petition to Quiet Title on September 17, 2019.

[17] No information is provided as to whether this fact remains true today.    An *Order Entering Default Judgment* was, however, entered in favor of the Respondent and against the Debtors based on Respondent's Third-Party Complaint on September 15, 2020 in the amount of $240,389.72 plus costs and interest and $50,500.32 in attorneys' fees (Adversary Docket No. 21)(the "Order of Default").    The Order of Default also provided on page 2 that the Transfer was "undone" as to the Debtors, but that "final disposition of the Property is dependent on the resolution" of this Adversary Proceeding.

## Discussion

### I.        Reversion

In support of its quiet title claim, the Petitioner argues that because the Respondent did not foreclose against the Property within seven (7) years of the maturity of the Debt as disclosed in the real property records, under O.C.G.A. § 44-14-80 title automatically reverted back to the Debtors and to Petitioner as successor-in-interest.[18]    Based on the recorded Modification Agreement, the original maturity date was extended to April 27, 2012, and according to the Petitioner, the reversion date became April 27, 2019.   Since foreclosure proceedings were not initiated prior to the reversion of title, the Petitioner asserts that the Security Deed is no longer enforceable, and the Respondent may not exercise the power of sale contained therein.  *See* O.C.G.A. §§ 44-14-81 (Bar of exercise of powers of sale), -82 (Bar of suit to recover property), & -83 (Suits to foreclose or to recover property barred after reversion of title).   The Respondent contends, however, that by its terms, the confirmed Plan extended the maturity date so that it became September 20, 2018, and thus the reversion date is September 20, 2025, such that it may still foreclose   The Petitioner counters this argument insisting that even if the maturity date was extended under the Plan, notice of this extension was not recorded in the Troup County, Georgia real estate records and so it does not operate to prevent an automatic reversion of title in accordance with O.C.G.A. § 44-14-80(b).

---

[18]  This provision states in pertinent part that "[t]itle to real property conveyed to secure a debt or debts shall revert to the grantor…seven years from the maturity of the debt or debts or the maturity of the last installment thereof as stated or fixed in the record of conveyance…."   O.C.G.A. § 44-14-80(a)(1).

Georgia law provides that title to real property held under a security deed reverts to the grantor/borrower seven (7) years from the maturity of the debt, or twenty (20) years after recordation of the security deed when the parties establish "a perpetual or indefinite security interest" as in the case of a revolving debt.   *See* O.C.G.A. § 44-14-80(a).[19]   If the security deed expires in this manner, the lender loses the right to commence foreclosure proceedings and may not enforce the obligation by seeking to recover the property under its loan documents.   *See Mike's Furniture Barn, Inc. v. Smith*, 342 Ga.App. 558, 560(2), 803 S.E.2d 800, 803 (2017)(citing O.C.G.A. § 44-14-83).   The underlying loan obligation, however, may be extended as well as the security interest for an additional seven (7) year period on certain conditions.   *See* O.C.G.A. § 44-14-80(b) & (c).

The Georgia Court of Appeals recently considered a similar situation in *Bell v. Freeport Title & Guaranty, Inc.*, 355 Ga.App. 94, 842 S.E.2d 565 (2020).   In that case, which also involved a quiet title action, the court was confronted with the question whether certain extensions of a loan's maturity date prevented a reversion of title so that the debt holder could foreclose on its collateral.   As the court observed, when the "maturity date has been extended *and recorded in the public record* before title reverts, the reversion date is extended 'for an additional period of seven years … [in accordance with] subsection (a) of this Code section from the date of the renewal[.]'" *Bell, supra,* 355 Ga.App. at 98, 842 S.E.2d at 569, quoting O.C.G.A. § 44-14-80(b) (emphasis

---

[19] Here, the Security Deed reflects a fixed maturity date regarding a loan that is specific in amount, and thus it appears there is no fact issue presented, and none has been raised by the parties, that the twenty-year reversion period applies.

supplied).[20]   Although the security deed had been recorded, the extensions were not and as a result, reversion occurred as provided under the statute and the debt holder no longer had the right to foreclose.[21]

As mentioned above, the Respondent contends the extension stated in the Plan is effective and precludes reversion in this case.   First, it states cases such as *Bell*, *supra*, are distinguishable because they did not address the modification of a maturity date through a confirmed bankruptcy plan.   Further, the Respondent counters the argument that the Plan and its modification of the maturity date needed to be filed to be effective by insisting that the Plan could not have been filed under applicable Georgia law since a plan is not among the three (3) specifically enumerated

---

[20] This provision states as follows:

> (b) *If the grantee* or the grantee's personal representatives, heirs, successors, or assigns, or any one of them if more than one, or an officer of a corporation having an interest shall, at any time *before* the title reverts as provided in subsection (a) of this Code section, *make and cause to be recorded upon the record of the conveyance or elsewhere in the public records*, with a notation of the place of record of the renewal on the record of the conveyance or, if not recorded, upon the conveyance, *a written renewal of the debt or debts secured or the part thereof which are not fully paid and are not barred*, which renewal shall be signed by the original grantor or the grantor's heirs, personal representatives, or successors in title to the real estate conveyed and shall be dated, *the conveyance and record thereof shall remain of full force and effect and the title shall not revert for an additional period of seven years* or 20 years according to the appropriate reversion period stated in subsection (a) of this Code section from the date of the renewal unless the debt or debts are paid sooner.

O.C.G.A. § 44-14-80(b)(Reversion of real property conveyed to secure debt; effect of renewal of debt)(emphasis supplied); *see also* O.C.G.A. § 44-14-80(c)(providing for filing an affidavit).

[21] The court in *Bell, supra*, 355 Ga.App. at 99, 842 S.E.2d 569, cited the Georgia Supreme Court's decision in *Minor v. Neely*, 247 Ga. 147, 273 S.E.2d 853 (1981) in support of the requirement that extensions be filed to prevent a reversion of title by operation of law in accordance with the statute.   Compare *Matson v. Bayview Loan Servicing, LLC*, 339 Ga.App. 890, 892, 795 S.E.2d 195, 196-97 (2016).

bankruptcy-related documents listed in O.C.G.A. § 44-14-590. [22]   The Respondent adds that

imposition of a recording requirement in this case would also be inconsistent with principles of

equity, since the Debtors enjoyed "the benefit of the continuing effectiveness of the security deed."

*See Stearns Bank, N.A. v. Mullins*, 333 Ga.App. 369, 374, 776 S.E.2d 485, 489 (2015).   Finally,

the Respondent states that the Petitioner should be equitably estopped from taking a different

position from the Debtors as it is acting on their behalf and they acknowledged a new maturity

date in their confirmed Plan.

The arguments of the Respondent are not persuasive.   First, even if the maturity date was

extended through the Plan, there is no basis for concluding such extension relieved the Respondent

from its responsibility to comply with state law regarding the continuing enforceability of its rights

under its loan documents.   The Respondent does not cite any statutory or case law authority to

support the proposition that bankruptcy law obviates the need to comply with state law real

property recording and notice statutes to prevent the automatic reversion of title as provided in

O.C.G.A. § 44-14-80.   Next, although O.C.G.A. § 44-14-590 lists specific bankruptcy-related

---

[22] Respondent cites O.C.G.A. § 44-14-590, which states as follows:

> *A certified copy of a petition*, with schedules omitted, commencing a proceeding under the
> Bankruptcy Reform Act of 1978, P.L. 95-598, codified at 11 U.S.C. Section 101, et seq., *or of the
> decree of adjudication in the proceeding, or of the order approving the bond of the trustee appointed
> in the proceeding* may be filed and recorded in the office of the clerk of the superior court of any
> county in the same manner as deeds are filed and recorded. It shall be the duty of the clerk to docket
> and index, under the name of the bankrupt, and record the certified copies of the petition, decree, or
> order filed for record in the same manner as deeds. Clerks shall be entitled to the same fees for
> docketing, indexing, and recording the copies of such petitions, decrees, or orders as for docketing,
> indexing, and recording deeds.

O.C.G.A. § 44-14-590 (Recording of copy of bankruptcy petition, decree of adjudication, or order approving trustee's
bond; right; clerk's fee)(emphasis supplied).

documents that may be filed in the Georgia real property records, O.C.G.A. § 44-14-80(c) and (d) not only expressly state that a document may be filed with regard to the renewal or extension of a debt, but that such filing must be accepted and operates to extend the reversion period.   Section 44-14-590 should not be read as the Respondent contends to exclude the operation of other statutorily authorized recording provisions under Georgia law.[23]

The Respondent's arguments that the equities of the case mandate against reversion are also unpersuasive.   Referring to the benefit received through modifications of a security deed in the context of a revolving line of credit, the court in *Stearns*, *supra*, as cited by the Respondent, concluded the borrower should not be able to *subsequently* claim that title had reverted back to him years before the lender had made advances under the loan arrangement that he had obtained.[24] In *Stearns*, however, the modifications had been recorded *and* they occurred after the reversion date asserted by the borrower.   Here the Plan modification was not recorded and occurred prior to the reversion date.   These distinctions militate against the conclusion that estoppel should be applied here to prevent reversion.   *See e.g. Hall v. CitiMortgage, Inc.*, 2019 WL 2866741 (Bankr. M.D. Ga. July 2, 2019)(granting summary judgment for debtor based on Georgia reversion law

---

[23] The Respondent's argument assumes that the Plan itself must be filed to properly reflect the extension contained in it.   That is flatly not the case.   Pursuant to O.C.G.A. § 44-14-80(c) and (d), the Respondent (or its predecessor in interest) could have, for example, required the Plan to include a provision for the execution by the Debtors and filing by the Respondent of a document in recordable form that reflected the extension and was cross referenced to the Security Deed.

[24] The main thrust of the analysis in *Stearns, supra*, focuses on the question of applicability of the twenty-year reversion period based on an intent to create an indefinite security interest in connection with a line of credit, though it also addressed the estoppel argument.

despite argument that she had received the benefit of two unrecorded loan modification agreements executed before the asserted reversion date).

The present case is also distinguishable from *Freeport Title & Guaranty, Inc. As Trustee of the 4977 Memorial Trust v. Tegeue*, 360 Ga.App. 18, 858 S.E.2d 554, 556 (2021). There, the appellant argued that the trial court erred in adopting the finding of an equitable exception to reversion by a special master that appellant was bound by the affirmations of the grantor, of whom it was a successor in interest, in a bankruptcy case. The grantor in that case had admitted in its bankruptcy papers that the debt holder held title (despite reversion) and it did not challenge a subsequent foreclosure sale. Although the court of appeals did not reach the appellant's assertion of error on this ground, in the present case reversion occurred *after* bankruptcy and a foreclosure sale was *not* completed.[25]

In terms of the equities herein, as noted in *Bell*, *supra*, it is the grantee's responsibility to record its documents and the Respondent could have taken steps to protect its interest. 355 Ga.App. at 99 n. 4, 842 S.E.2d at 569 n. 4, citing *Reidling v. Holcomb*, 225 Ga.App. 229, 230-32 (1), 483 S.E.2d 624 (1997).[26] This conclusion is not altered by the contention that the Petitioner is somehow "acting on [the Debtors'] behalf" as argued by the Respondent, such that it should not

---

[25] The court in *Tegeue* further observed that unlike O.C.G.A. § 44-14-80(b), which requires extensions to be filed, the statute anticipates and addresses situations where the conveyance itself might not be filed. *Tegeue, supra*, 858 S.E.2d at 558 n. 6, citing O.C.G.A. § 44-14-80(a). In that case, the court ruled that the reversion provision under O.C.G.A. § 44-14-80(a)(2) did not apply because the maturity date had been fixed in the security deed.

[26] The statute provides that the seven-year period may be extended by renewal signed by the grantor, or by affidavit filed by the grantee. O.C.G.A. § 44-14-80(c). As provided on page 4 of the Confirmation Order after stating that the automatic stay was dissolved as of the Effective Date, the Court further stated that "nothing shall bar the filing of financing documents or taking of such other actions as are necessary to effectuate the transactions specifically contemplated by the Plan or this Order prior to the Effective Date."

be allowed to adopt a different position regarding the maturity date of the Debt herein resulting from application of state law from that acknowledged by the Debtors in their confirmed Plan.[27]

Based on the foregoing discussion, title to the Property as granted by the Debtors to BB&T and assigned to the Respondent reverted to the Debtors on April 27, 2019 by operation of O.C.G.A. § 44-14-80, and summary judgment will be granted to the Petitioner on its Petition to Quiet Title.[28]

## II.    Counterclaims

The Respondent also asserts that it is entitled to summary judgment on its Counterclaims set forth as follows: (1) Fraudulent Transfer Under O.C.G.A. § 18-2-74; (2) Fraudulent Transfer Under O.C.G.A. § 18-2-75; (3) Fraudulent Postpetition Transfer Under 11 U.S.C. § 549; (4) Tortious Interference With Contract; and (5) Attorneys' Fees and Expenses Under 11 U.S.C. § 503.[29]

With respect to the first two Counterclaims, the Respondent argues that the Transfer of the Property by Quitclaim Deed from the Debtors to the Petitioner should be declared void because it was made with actual or constructively fraudulent intent.  Actual intent "to hinder, delay, or defraud" a creditor may be demonstrated through the presence of a number of recognized factors or badges of fraud.  *See* O.C.G.A. § 18-2-74(a)(1); O.C.G.A. § 18-2-74(b); *Howell v. Fulford (In*

---

[27] Estoppel based on the borrower's agreement also simply does not make sense in this context.  If estoppel based on the borrower's agreement were permitted, the statute would never apply, because the borrower has always agreed to the extension.  The statute assumes the extension has been agreed to, but it nevertheless requires the modification be recorded to extend the reversion date.

[28] As noted above, the Plan (¶ 4.3) describes Bayview Loan Servicing, LLC as holding a claim in the aggregate amount of $174,684.05 secured by a first priority interest in the Ashford Circle Tract to be paid over 180 months.

[29] The Respondent admits its claim for attorneys' fees under O.C.G.A. § 13-6-11 cannot be granted on summary judgment.

*re Southern Home & Ranch Supply, Inc.)*, 561 B.R. 810, 817 (Bankr. N.D. Ga. 2016).[30]

According to the Respondent, many of these factors are shown here, such as the Debtors' retention of control over the Ashford Circle Tract, their concealment of the Transfer during negotiations regarding the Debt, the fact that they received only minimal consideration, and finally, that they were or became insolvent.   In addition, the Respondent argues that the Petitioner cannot mount a viable defense under O.C.G.A. § 18-2-78(a) that it "took in good faith for a reasonably equivalent value" as it allegedly "designed the entire scheme…with the express intent to hinder [the Respondent's] collection efforts."   Respondent's Motion, p. 12.

The Respondent further insists constructive fraudulent intent has been established under O.C.G.A. § 18-2-74(a)(2) because the Debtors received less than reasonably equivalent value, as Petitioner's conditional promise to "clear up title" is insufficient. The Debtors were also insolvent at the time they executed the Quitclaim Deed since they were not paying the Debt they owed to the Respondent under the Plan.   *See* O.C.G.A. § 18-1-72(a) & (b)(When debtor or debtor partnership is insolvent).[31]

The Petitioner responds that fraud has not been shown against it or the Debtors because the Respondent may still enforce the Debt against the Debtors through the Note.   Further, in terms of value, the Property was unmarketable at the time of the Transfer due to the Respondent's clouding the title through its initiation of foreclosure proceedings.   In addition, no evidence of the Debtors'

---

[30] The Respondent states that even on a motion for summary judgment, the fact that so many badges of fraud are present supports a conclusion that the Debtors had the requisite intent.   *See e.g. Walton v. Williamson (In re Williamson)*, 2013 WL 441418, at *4 (Bankr. S.D. Ga. Feb. 1, 2013).

[31] A claim under O.C.G.A. § 18-2-75 is similar to one asserted under O.C.G.A. § 18-2-74(a)(2).   Compare *Kipperman v. Onex Corp.*, 411 B.R. 805, 834 (2009), denying reconsideration in part, 2010 WL 761227 (N.D. Ga. Mar. 2, 2010).

insolvency has been presented and, finally, the transfer was disclosed by virtue of its contemporaneous recording.

Although the Transfer may appear to be unusual in some respects, the Court cannot conclude that the Respondent has demonstrated the absence of a genuine issue of material fact such that it is entitled to judgment as a matter of law against the Petitioner for either actual or constructive fraud. As to actual fraud, a number of alleged badges of fraud are alleged but most of them appear to be disputed or to lack relevant information, such as whether the Debtors received reasonably equivalent value in exchange for the Transfer, whether the Debtors were insolvent, or whether (and for how long) the Debtor's continued to reside in the Property. Conversely, there is some question regarding why all the Debtors' unencumbered property is titled in the Petitioner's name and leased to the Debtors, or their designee, and how long such property is to be leased. With respect to constructive fraud, insolvency is not established solely because the Debtors did not pay the Respondent. The Respondent must establish that the Debtors were not generally paying their debts as they came due. There are also issues regarding the value the Petitioner provided to the Debtors by fronting legal fees and by agreeing to resell the Ashford Circle Tract to the Debtors and lease the other tracts, and whether same constitutes reasonably equivalent for the Transfer. These issues present genuine disputes of material facts and will require further factual development,[32] such that summary judgment is not appropriate.

---

[32] Ordinarily in a bankruptcy context, a trustee is authorized to bring state law actions to avoid prepetition transfers under 11 U.S.C. § 544, and 11 U.S.C. § 549 provides the means for challenging a post-petition transfer of estate property. *See Cooper v. Bullock (In re Bullock),* 2012 WL 2930678 (Bankr. N.D. Ga. June 12, 2012). Here, the Respondent is seeking to assert its rights as a creditor to avoid a post-confirmation transfer under state fraudulent conveyance law, and the parties consent to the jurisdiction of this Court to resolve such claims.

The Respondent also contends that it may avoid the Transfer under 11 U.S.C. § 549.   To succeed under Section 549(a), a trustee must show "(1) a post-petition transfer (2) of estate property (3) which was not authorized by the Bankruptcy Code or the court."   *See Marathon Petroleum Co. v. Cohen (In re Delco Oil, Inc.)*, 599 F.3d 1255, 1258, 1262 (11th Cir. 2010); *Scarver v. Ellis (In re McKeever)*, 567 B.R. 652, 659 (Bankr. N.D. Ga. 2017).   Although the Court entered the Order Administratively Closing Case, the Respondent maintains such action did not close this case for purposes of Section 549(d) and is not the same as a dismissal of the case.[33]   Moreover, the Court previously granted the Respondent derivative standing to pursue such a claim.[34]

The Transfer occurred post-petition, but the parties disagree whether the Property constituted "estate property" at the time of its conveyance and whether the Transfer was adequately authorized.   Both parties rely on Paragraph 10.1 – Vesting of Debtors' Assets of the Plan, which provides as follows:

> Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in Debtor as of the Filing Date, free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors, except as specifically provided in the Plan.   As of the Effective Date, Debtor may operate its businesses and use,

---

[33] An action under Section 549(d) "may not be commenced after the earlier of (1) two years after the date of the transfer sought to be avoided; or (2) the time the case is closed or dismissed."   The Respondent argues that "[i]n the context of individual debtor chapter 11 cases, the concept of administrative closing appears to be a legal construct intended to represent something qualitatively less final than statutory closing."   *See In re Garcia*, 2018 WL 3524581, at *3 (Bankr. D. Mass. July 20, 2018); *see also Martinez v. Carnival Corp.*, 744 F.3d 1240, 1244-45 (11th Cir. 2014). Because the Court finds this claim is otherwise subject to dismissal, this issue is not addressed here.

[34] On January 6, 2020, the Court entered an *Amended Order Granting Motion For Derivative Standing To Bring Avoidance Action* (Main Case Docket No. 134)(the "Derivative Standing Order") with regard to the Respondent's assertion of an avoidance claim under Section 549 against both the Debtors and the Petitioner.

> acquire, and dispose of property and settle and compromise Claims or Interests
> without supervision of the Bankruptcy Court, free of any restrictions of the
> Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly
> imposed by the Plan and Confirmation Order.

Based on this provision, the Respondent contends that the Property did not revest in the Debtors

on the Effective Date because it was "otherwise explicitly provided in the Plan" through specific

terms concerning the Property and the anticipated treatment of the Respondent's allowed secured

claim. *See also* 11 U.S.C. § 1141(b); compare *Lee Servicing Co. v. Wolf (In re Wolf)*, 162 B.R. 98,

106 (Bankr. D. N.J. 1993)(considering issue of vesting in chapter 13 case). The Respondent

further asserts that the Property did not revest because it was necessary for the Debtors'

reorganization. Here, the Respondent urges the Court to employ the "estate transformation

approach" used in chapter 13 cases.[35]  According to the Respondent, the Property was necessary

to the Plan's fulfillment in assuring satisfaction of the Debt.  *See Black v. United States Postal*

*Service (In re Heath)*, 115 F.3d 521, 523 (7th Cir. 1997).   In addition, the Respondent maintains

that because the Property included the Debtors' residence, it was necessary for an effective

reorganization on that basis and did not revest in the Debtors for that reason as well.  *See In re*

*Ramos*, 357 B.R. 669, 672 (Bankr. S.D. Fla. 2006).

For these reasons, the Respondent asserts that the Property remained property of the estate

and thus prior court approval and authorization was required before the Debtors could convey the

Property and was not obtained.  *See Turek v. Dehart (In re Turek)*, 346 B.R. 350, 360 (Bankr.

---

[35] *See Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333, 1340 (11th Cir. 2000), *cert. denied*, 531 U.S. 1073, 121 S.Ct. 765, 148 L.Ed.2d 666 (2001)(adopting "estate transformation approach" returning such property to control of debtor as is not necessary for plan's fulfillment).  *See also 1st Franklin Fin. Corp. v. Baker (In re Baker)*, 2018 WL 4961656, at *3 (Bankr. N.D. Ga. Oct. 12, 2018)(quoting *Telfair, supra*); *EconoLube N' Tune, Inc. v Frausto (In re Frausto)*, 259 B.R. 201, 209 n. 15 (Bankr. N.D. Ala. 2000)(collecting cases interpreting vesting provisions in chapter 13).

M.D. Pa. 2006)(absent revesting, debtor may not sell estate property without court approval).[36]   If the Transfer is permitted to stand, the Respondent states its rights under the Plan as confirmed will be substantially changed, frustrating the parties' agreed treatment of its claim whereby it would be secured until paid in full.   *See* Confirmation Order.

The Petitioner responds that the Debtors had authority to transfer the Property because the Plan had been substantially consummated as found in the Order Administratively Closing Case, which states on page 1, "[t]he Court finds that the Debtor's Plan of Reorganization (Doc. No. 60) has been substantially consummated in accordance with 11 U.S.C. § 1101(2) and the estate has been fully administered, except for the completion of all plan payments."   The Debtors then assumed management of all the property treated in the Plan and did not need court authority to transfer such property.   *See* Plan, ¶ 10.1 (quoted above).

The Petitioner further urges that the prohibition against the sale of property by a debtor in whom estate property is not vested, as stated in *Turek v. Dehart, supra*, 346 B.R. 350, is inapplicable here because that case involved a chapter 13 debtor still operating under a repayment plan.   The present case, however, concerns chapter 11 debtors who had authority to dispose of property through the Transfer without court approval based on the Confirmation Order and the terms of the Plan and given the stage of this case in which the Plan had been substantially consummated.

---

[36] The Respondent further asserts that the Petitioner does not benefit from the statutory defense provided in Section 549(c) since the Petitioner was not a good faith purchaser and did not pay "present fair equivalent value."

On review of this issue, the Property is not property of the estate in these circumstances.[37] The "estate transformation rule" does not apply in Chapter 11 cases.   In *Telfair*, the 11th Circuit chose the rule from among three (3) different rules that have developed in Chapter 13 regarding the revesting of property (primarily the debtors wages and other income) after confirmation of a plan.   In so doing, the Circuit Court had to harmonize 11 U.S.C. § 1327(b), which is almost identical to 11 U.S.C. § 1141(b) in revesting all property of the estate in the debtor after confirmation, with 11 U.S.C. § 1306(a)(2), which provides that all of the debtor's income between the filing and the closing, dismissal or conversion of the case is property of the estate.   Because there is no similar second provision in Chapter 11, there is no need for an "estate transformation rule", or any of the other competing Chapter 13 post-confirmation vesting rules, here.

Instead, this question is governed by 11 U.S.C. § 1141(b) and the terms of the Plan.[38] Section 1141(b) provides that:

> Except as provided in the plan or the order confirming the plan, the confirmation of the plan vests all property of the estate in the debtor.

The relevant provision of the Plan, Paragraph 10.1, is set forth above.   That provision reinforces, rather than alters, Section 1141(b).   In that regard, the Respondent does not read Paragraph 10.1 correctly.   The qualifier "except as specifically provided in the Plan" does not modify the provisions regarding the revesting of property; instead, it modifies the phrase that appears immediately prior before it – "free and clear of all Claims, Liens, charges, encumbrances,

---

[37]   In addition, the estate transformation approach seems inapplicable in this instance because the Property is real estate the Debtors owned when the case was filed and not post-confirmation earnings in a Chapter 13 situation, which raises the attendant question of such income's status in relation to the completion of required plan payments.

[38] The Confirmation Order does not address the revesting of property of the estate.

rights and Interests of creditors."[39]  So, for example, it means that the Property revests in the Debtors, but because the Plan provides for BB&T to have a secured claim and for its security, Security Deed, to continue, the Property revests in the Debtors subject to the Security Deed.   This provision does not state, however, that vesting of the Property in the Debtors is otherwise restricted.

Based on the foregoing analysis, the Respondent has not demonstrated entitlement to judgment on its avoidance claim under Section 549 as a matter of law for purposes of summary judgment.   Because the Court has serious reservations that a claim under Section 549 could be made given the facts presented, the Court is instead inclined to grant judgment against the Respondent on this claim pursuant to Federal Rule of Civil Procedure 56(f)(1), made applicable here by Federal Rule of Bankruptcy Procedure 7056.   Pursuant to Rule 56(f)(1), the Court will allow the Respondent additional time to address this issue before finally deciding the matter.

Next, the Respondent asserts entry of summary judgment in its favor is warranted on its claim of tortious interference with contract.   Under Georgia law, a claim alleging "interference with contractual relations, business relations, or potential business relations," is shown by proving the following:

(1) improper action or wrongful conduct by the defendant without privilege;
(2) the defendant acted purposely and with malice with the intent to injure;
(3) the defendant induced a breach of contractual obligations or caused a party of third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and
(4) the defendant's tortious conduct proximately caused damage to the plaintiff.

---

[39]  This language mirrors in substance 11 U.S.C. § 1141(c).

*Disaster Servs., Inc. v. ERC P'ship*, 228 Ga.App. 739, 740, 492 S.E.2d 526, 528 (1997)(citations omitted).   The Respondent alleges the Petitioner acted improperly through its encouragement of the Debtors to participate in the Transfer of the Property in furtherance of its express intent to frustrate the Respondent's right to enforce collection of the Debt through its loan documents.   It also contends the Petitioner induced the Debtors to breach their agreement under the loan documents by conveying the Property without notice to or approval of the Respondent.   As a result, the Respondent's ability to collect its Debt has been hindered if not eliminated.

The Petitioner responds that it did not induce the Debtors to default on their obligations to the Petitioner under its loan documents or the Plan as they were already in default when it began its discussions with them.   It also refutes any claim that it caused damage to the Respondent since the Respondent either has its right to foreclose, if a reversion did not occur, or does not have such a right if reversion in fact did occur, and the Transfer did not otherwise interfere with the Respondent's contractual rights.

To succeed on a claim for tortious interference, more must be shown than that a party merely persuaded a person to breach a contractual promise.   *See Sommers Co. v. Moore*, 275 Ga.App. 604, 605-06, 621 S.E.2d 789, 791 (2005).   Further, "'improper action or wrongful conduct'" has been defined to include "'predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions.'"   *Sommers, supra*, 275 Ga.App. at 606, 621 S.E.2d at 791, quoting *Disaster Servs.*, *supra*, 228 Ga.App. at 741-42, 492 S.E.2d at 529 (citation omitted); *see also DBG Benefit Solutions, Inc. v. Argus Holdings, Inc.*, 2010 WL 11597657, *2 - *3 (N.D. Ga.

24

Sept. 30, 2010).   A review of the pleadings does not show that sufficient facts have been established beyond dispute that the Respondent is entitled to summary judgment on this claim.

As to the first element, improper action or wrongful conduct, none of the factors identified above have been alleged or admitted with regard to the Respondent's Statement of Facts.   The second element also seems to be lacking in that it has not been established through undisputed facts how exactly the Petitioner induced the Debtors to breach their agreement with the Respondent by recognizing a potential legal issue brought to their attention by the Petitioner, or how or why the Petitioner's discussions with the Debtors amount to malice with an intent to injure the Respondent.   Regarding the final element, the Respondent has not shown through undisputed evidence how such allegedly tortious conduct proximately caused it damage.   The Respondent's ability to collect its Debt undoubtedly has been affected by the loss of its security.   It appears, however, that the Petitioner acted on a legal infirmity it discovered regarding the Respondent's right to foreclose and that it entered into a transaction where the Property would be conveyed to it on discounted terms whereby it would then litigate the title issue in court.   Again, not only is the Respondent not entitled to summary judgment on this claim based on the foregoing analysis, but the Court is inclined to enter judgment against the Respondent on this claim.   As with the claim under 11 U.S.C. § 549, however, the Court will allow the Respondent additional time to address this issue further pursuant to Rule 56(f).

Finally, given the Court's ruling herein, attorneys' fees under 11 U.S.C. § 503 as an administrative expense based on benefit to the estate do not appear to be warranted as none has been shown.   With respect to the Respondent's claim for attorneys' fees under O.C.G.A. § 13-6-11, as noted by the Respondent, such a claim cannot be awarded at the summary judgment stage.

The Court further observes, however, that based on its ruling in favor of the Petitioner, it appears the Petitioner's actions do not demonstrate bad faith or stubborn litigiousness prior to the initiation of this litigation as to support an award of fees and further hearing thereon is unnecessary. *See generally Nash v. Studdard*, 294 Ga.App. 845, 851-52, 670 S.E.2d 508, 515 (2008).

### Conclusion

In view of the foregoing discussion, it is

**ORDERED** that the Petitioner's Motion is **GRANTED** and that the Respondent's Motion is **DENIED on the quiet title claim and the issue of reversion,** and it is further

**ORDERED** that title to the Property is not encumbered by the Respondent's Security Deed.   It is further

**ORDERED** that with respect to the Counterclaim for fraudulent transfer under O.C.G.A. §§ 18-2-74 and 18-2-75, the Respondent is not entitled to summary judgment on the present record as there remain genuine issues of material fact so the Respondent's Motion is **DENIED;** it is further

**ORDERED** with regard to the Counterclaims for voidable post-petition transfer under 11 U.S.C. § 549 and tortious interference with contract, the Respondent's Motion is **DEFERRED** and Court will allow the Respondent through and including **October 29, 2021** to supplement its motion for summary judgment on these issues in light of the above discussion, and the Petitioner may file a response to any such supplement on or before **November 19, 2021**; and it is further

**ORDERED** that the Respondent's claims regarding attorneys' fees under 11 U.S.C. § 503 and/or O.C.G.A. § 13-6-11 are **DENIED**.

26

The Clerk is directed to serve a copy of this Order upon counsel for the Petitioner, counsel for the Respondent, the Debtors, and counsel for the Debtors.

**[END OF DOCUMENT]**